IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCHES OF:<br><br>One Black iPhone, Exhibit N-3, seized from Layton Williams on April 7, 2021<br>**TARGET DEVICE 1**<br><br>One Black iPhone, Exhibit N-4, seized from Layton Williams on April 7, 2021<br>**TARGET DEVICE 2**<br><br>One Black iPhone, Exhibit N-5, seized from Layton Williams on April 7, 2021<br>**TARGET DEVICE 3**<br><br>One Rose Gold iPhone, Exhibit N-6, seized from Layton Williams on April 7, 2021<br>**TARGET DEVICE 4**<br><br>One Grey iPhone, Exhibit N-7, seized from Layton Williams on April 7, 2021<br>**TARGET DEVICE 5**<br><br>**ITEMS ARE CURRENTLY IN THE CUSTODY OF THE DRUG ENFORCEMENT ADMINISTRATION (DEA) AT THE PITTSBURGH DEA DISTRICT OFFICE** | Magistrate No: 21-1212 |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS FOR CELLULAR PHONE

I, Karl Ash, being duly sworn depose and state:

1

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant authorizing the examination of property; five electronic devices (the "Devices") **were seized on April 7, 2021**. The device is currently in the possession of the Drug Enforcement Administration.

2. As set forth below, I have probable cause to believe that the recovered device contains evidence of crimes in violation of 21 U.S.C. §§ 841(a)(1) (unlawful distribution of controlled substances), and 846 (conspiracy to distribute a controlled substance).

3. I, Karl Ash, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, state as follows:

4. I am an "Investigative or Law Enforcement Officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

5. I am a Special Agent with the Drug Enforcement Administration (DEA), and have been so employed since December 2009. I am currently assigned to the DEA's Pittsburgh District Office ("PDO"), within the Philadelphia Field Division. As a DEA Special Agent, I have received extensive training pertaining to narcotic investigations and the investigations into the unlawful distribution of illegal drugs, in violation of Title 21 of the United States Code. I have conducted or participated in, among other things, surveillance, undercover transactions, and execution of search and arrest warrants, debriefings of informants and confidential sources, and reviews of taped conversations relating to narcotics trafficking. I have also assisted in the execution of numerous drug-related searches and arrest warrants.

2

I know that distributing and possessing with intent to distribute controlled substances is a felony offense under Title 21 of the United States Code, as is conspiring to do so.

6. Based on my training and experience, I am familiar with the methods of operation employed by drug trafficking organizations operating at the local, state, national, and international levels, including those involving the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and will carry those devices with them where ever they go. I am also aware that drug traffickers often speak in vague, guarded, coded language or employ text messaging when discussing their illegal business in an effort to further prevent detection. I am familiar with the common appearance, packaging, texture, and smell of narcotics including cocaine, crack cocaine, oxycodone, heroin, and other illegal drugs.

7. Further, based on my training and experience, I am aware that it is common practice for drug traffickers who desire to insulate themselves from detection by law enforcement, to routinely utilize multiple telephones, counter surveillance, false or fictitious identities, and coded communications in order to communicate with their customers, suppliers, couriers, and other conspirators. Moreover, it is not unusual for them to initiate or subscribe such phone services in fictitious names or under the name of an associate or family member in an effort to thwart detection by law enforcement. It is now a common practice for drug traffickers to utilize all communication features of their telephones, most notably the voice call and text message features, nearly simultaneously, to communicate with their

conspirators and customers. For example, it is quite common for a particular transaction to be set up and completed using both voice calls and text messages. In fact, it is now quite unusual for a drug trafficker to utilize solely one feature of a telephone, such as the voice call feature, to further his criminal activities while not also using another feature, such as the text message feature, to further his criminal activities.

8. Further, your affiant is aware that drug traffickers sometimes use their cellular telephones and tablets to take and retain photographs and videos of their drugs, firearms, and narcotics sales proceeds. Such traffickers, like law-abiding citizens, sometimes take photographs and videos using their cellular telephones of themselves with their friends, relatives, and associates and keep the photographs on their cellular telephones. Such photographs and videos, when taken or retained by drug traffickers, can be evidence, and can lead to additional evidence of illegal trafficking activity by identifying the traffickers, contraband, and people who are actively assisting and/or supporting the trafficking activity as well as the locations where they live or where they store their drugs, proceeds, or paraphernalia.

9. Your affiant is aware that evidence of drug and firearm crimes can often be found in electronic media, including cellular telephones, laptop computers, cameras, and tablet devices. Such evidence can be found throughout those items, such as in text messages, contact lists indicating the names and numbers of associates, call/text logs indicating calls/texts made to and received from associates, online search history files, word processing documents, photographs and video files. It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to

calling, text messaging and photographing, can now be performed from many cell phones. In addition, as noted above, those involved in drug and firearm trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of such trafficking. Moreover, the specific numbers of, and the specific numbers dialed by, particular cellular telephones can be evidence of drug trafficking, particularly in light of the fact that it is a practical necessity that drug traffickers communicate with each other, as well as with their customers and suppliers, by telephone. Such numbers can confirm identities of particular associates and the occurrence of certain events.

10. Due to narcotics traffickers' heavy reliance on cellular telephones to conduct their business, evidence of drug crimes can often be found on cellular telephones. For example, when a lower-level narcotics dealer receives an order (either in person or by telephone) for heroin or cocaine, that dealer may place a call or send a text message to a higher-level narcotics dealer indicating that he needs more narcotics to provide to the customer. Accordingly, evidence of such a narcotics conspiracy can be found in various locations in a cellular telephone, such as in text messages, contact lists indicating the names and numbers of associates, and call logs indicating calls made to and received from associates. This evidence of a narcotics conspiracy is critical to law enforcement's ability to locate and arrest all individuals involved in a particular narcotics sale.

11. Last, as with most electronic/digital technology items, communications made from an electronic device, such as a cellular telephone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving a text message or a

contact or an e-mail. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a cellular telephone. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, stored, deleted, or viewed.

12. I am submitting this affidavit in support of an application for a warrant to search five cellular telephones, the devices seized from Layton WILLIAM's vehicle during a traffic stop on April 7, 2021. I have obtained the information contained in this affidavit from my own participation in this investigation as well as from my conversations and interactions with other law enforcement agents and officers.

13. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and it does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

14. The devices to be searched are:

    a. One Black iPhone, DEA Exhibit N-3 ("Target Device 1")

    b. One Black iPhone, DEA Exhibit N-4 ("Target Device 2")

    c. One Black iPhone, DEA Exhibit N-5 ("Target Device 3")

    d. One Rose Gold iPhone, DEA Exhibit N-6 ("Target Device 4")

    e. One Grey iPhone, DEA Exhibit N-7 ("Target Device 5")

The devices are currently located at the Pittsburgh Drug Enforcement Administration District

Office. As described below, there is probable cause to conclude that the device contains evidence of the commission of the federal felony offenses as listed in Attachment A.

15. The applied-for warrant would authorize the forensic and/or manual examination of the device for the purpose of identifying electronically stored data particularly described in Attachment A.

## **PROBABLE CAUSE**

16. I am currently participating in the investigation of Layton Williams. The statements contained in this Affidavit are based on my experience and background as a Special Agent with the DEA and the investigation of Layton Williams. For the reasons set forth below, there is probable cause to believe that on or about April 7, 2021, Layton Williams received U.S. Currency as payment for a previous marijuana transaction, in violation of Title 21, United States Code, Section 846. Because this affidavit is being submitted for the limited purpose of supporting probable cause to search as stated herein, I have not included each and every fact known to me concerning this investigation.

17. On April 7, 2021, investigators with the Westmoreland County High Intensity Drug Trafficking Area (HIDTA) Task Force received information from a Pennsylvania State Police Trooper that a Honda Pilot with Connecticut license plate AT74884, driven by Layton Williams contained one known hidden compartment and was believed to be headed to the Hilton Garden Inn in Robinson Township Pennsylvania.

18. As the Honda Pilot neared the Pittsburgh area, Investigators from Westmoreland County HIDTA started conducting mobile surveillance. Investigators from DEA also started

conducting surveillance at the Hilton Garden Inn at 303 Park Manor Drive, Pittsburgh, PA 15205.

19. Investigators observed Williams drive to a Marathon gas station on Steubenville Pike, Oakdale, Pennsylvania at approximately 11:21 AM. Williams was observed walking around his vehicle and talking on a cellular telephone. Williams stayed at the Marathon gas station for approximately 17 minutes, then he left gas station in the Honda Pilot. At approximately the same time Williams drove away from the gas station, Investigators conducting surveillance at the Hilton Garden Inn observed an unknown male (later identified as Michael Lawrence Glanton) exit the back door of the Hilton Garden Inn carrying a black backpack. Investigators observed Glanton put the backpack into the driver's side of a white Dodge Ram pickup with Ohio license plate JIM5975.

20. Investigators were able to follow Williams from the Marathon gas station to the parking lot of the Mall at Robinson, where Williams parked the Honda Pilot near the JC Penny's store. Glanton was observed driving the Dodge Ram away from the Hilton Garden Inn and arriving at JC Penny's parking lot approximately four minutes later. Glanton parked next to Williams and the two met and talked outside their vehicles for approximately 13 minutes. Investigators then observed Williams and Glanton reenter their respective vehicles and drive out of the parking lot in tandem.

21. Investigators followed the two vehicles as they drove away from the mall parking lot. The two vehicles drove to a Red Roof PLUS+ on Steubenville Pike. The two vehicles drove into the parking lot and then a short time later drove out of the parking lot. The amount of time spent in the Red Roof parking lot was about the same amount of time it would take to

slowly drive around the hotel. The two vehicles then drove back down Steubenville Pike in the direction they originally came from. The two vehicles then entered the GetGo gas station on Steubenville Pike, and both parked at the gas pumps. Based on my training and experience, it is Your Affiant's belief that Williams and Glanton were conducting counter surveillance in an attempt to identify law enforcement. The parking lot of the Red Roof PLUS+ has only one entrance/exit. I know that a common counter surveillance technique is to drive into similar type area (only one entrance/exit) to identify any vehicles that may be following. Also, after driving through the Red Roof parking lot, Williams and Glanton went to the GetGo gas station. When leaving the mall, Williams and Glanton drove past the GetGo on their way to the Red Roof, then immediately drove the opposite direction on the same road to get back to the GetGo. I know that this is another common counter surveillance technique to identify vehicles that may be following since it is not common for a vehicle to travel one direction on a road, then immediately travel the opposite direction on the same road.

22. When Williams and Glanton left the GetGo, Investigators followed Williams and Glanton over to the parking lot of the Kohl's department store, where Williams and Glanton parked their vehicles next to each other. Investigators then observed Glanton get out of his vehicle and he was looking around as if looking for something or to see if anyone was watching. Investigators then observed Glanton take a dark colored bag from his truck and pass it through the driver's side window of the Honda Pilot into William's possession. Approximately five minutes later, both Glanton and Williams left the Kohl's parking lot in

their respective vehicles. Investigators followed Williams as he drove away onto Interstate 376 Westbound.

23. Based on the observations by Investigators, a traffic stop was conducted on Williams on Interstate 376, and a search of his vehicle was conducted. During the search, a second hidden compartment was located inside the vehicle which contained two heat sealed bags of US Currency. The amount of currency was later determined to be $90,060. Also within the vehicle were the five iPhones identified in this affidavit. Williams told investigators that the vehicle was not his and that he didn't know anything about the hidden compartments or currency. Williams declined to give any other information to investigators.

24. Following the traffic stop, Investigators returned to the Hilton Garden Inn in an attempt locate Glanton. Glanton's Dodge Ram was observed parked in the rear of the hotel. A short time later, Glanton was observed leaving the hotel and walking towards his truck. Glanton was briefly detained until other Investigators arrived. Once additional Investigators arrived, Glanton was advised of the investigation. Glanton voluntarily agreed to cooperate with Investigators and gave consent to search his vehicle and hotel room. Glanton told Investigators that he drove in from his home in Ohio to meet Williams. Glanton stated that he owed Williams money ($40,000) for marijuana (20 pounds) that he previously received. Glanton stated that Williams changed the meet location from the Hilton Garden Inn to the JC Penny's parking lot. Glanton stated that he gave Williams $40,000 in US Currency in the parking lot Kohl's. Glanton also stated that Williams will contact Glanton on the Signal messaging app.

25. Based on the facts and circumstances surrounding the surveillance and traffic stop of Williams, and my training and experience, I believe that Williams received and possessed US Currency derived from the distribution of a Schedule 1 controlled substance on April 7, 2021.  It is also my belief that Williams uses multiple cellular phones to conduct his narcotic trafficking activities, and that a search of these electronic devises will yield evidence of these activities.  The cellular devices have been in DEA custody since the date of their seizure.

## CONCLUSION

26. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the device described above to seek the items described in Attachment A.

Respectfully submitted,

/s/ Karl Ash

**Karl Ash**
Special Agent - DEA
Pittsburgh District Office

Sworn and subscribed to me
by telephone pursuant to Federal R.
Crim. P. 4.1(b)(2)(A), this 10th day of June 2021

_____
HONORABLE PATRICIA L. DODGE
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

*Target Device 1*

The property to be searched is a Black iPhone (Exhibit N-3). The black iPhone is currently in the custody of the Drug Enforcement Administration (DEA) at the Pittsburgh DEA District Office. This warrant authorizes the forensic examination of the black iPhone for the purpose of identifying the electronically stored information described in Attachment B.

*Target Device 2*

The property to be searched is a black iPhone (Exhibit N-4). The black iPhone is currently being stored at the DEA Pittsburgh District Office. This warrant authorizes the forensic examination of the iPhone phone for the purpose of identifying the electronically stored information described in Attachment B.

*Target Device 3*

The property to be searched is a black iPhone (Exhibit N-5). The black iPhone is currently being stored at the DEA Pittsburgh District Office. This warrant authorizes the forensic examination of the iPhone for the purpose of identifying the electronically stored information described in Attachment B.

*Target Device 4*

The property to be searched is a rose gold iPhone (Exhibit N-6). The rose gold iPhone is currently being stored at the DEA Pittsburgh District Office. This warrant authorizes the forensic examination of the iPhone for the purpose of identifying the electronically stored information described in Attachment B.

*Target Device 5*

The property to be searched is a grey iPhone (Exhibit N-7). The grey iPhone is currently being stored at the DEA Pittsburgh District Office. This warrant authorizes the forensic examination of the iPhone for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1. All records on the Devices described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846, including:

   a. incoming and outgoing call and text message logs;

   b. contact lists;

   c. photo and video galleries;

   d. sent and received text messages;

   e. online searches and sites viewed via the Internet;

   f. online or electronic communications sent and received, including email, chat, and instant messages;

   g. sent and received audio files;

   h. telephone settings, including speed dial numbers and the telephone number for the subject telephone and related identifying information such as the Electronic Serial Number (ESN) for the telephone;

   i. messages drafted but not sent;

   j. Voice messages.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3. In searching the Device, federal agents may examine all of the data contained in the Device to view their precise contents and determine whether the Device and/or data falls within the items to be seized as set forth above. In addition, they may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth above.